# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **B. J. TIDWELL INDUSTRIES, INC.** | § | |
| **d/b/a CARDELL KITCHEN &** | § | |
| **BATH CABINETRY,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **DIVERSIFIED HOME PRODUCTS, INC.,** | § | **SA-06-CA-0264 FB (NN)** |
| **JIM HINDMAN and** | § | |
| **IRENE CUELLAR,** | § | |
| | § | |
| **Defendants/Counter-Plaintiffs.** | § | |

## MEMORANDUM AND RECOMMENDATION

**TO:   Hon. Fred Biery**
     **United States District Judge**

This order addresses the pending motion for summary judgment.[1]  I have authority to

make this recommendation pursuant to the district court's order of referral.[2]  After considering

the motion and the pleadings on file, I recommend granting the motion.

### Background of the Case

This lawsuit arose from a dispute between a cabinet manufacturer and its

customer/distributor.  Plaintiff B.J. Tidwell Industries, Inc., d/b/a as Cardell Kitchen and Bath

Cabinetry (Cardell), manufactures kitchen and bath cabinets.  Diversified Home Products, Inc.

(Diversified), supplies cabinets to homebuilders and contracted with Cardell to purchase

---

[1]Docket entry # 78.

[2]Docket entry # 50.

cabinets.  Defendants Jim Hindman and Irene Cuellar own Diversified and secured Diversified's

account with Cardell for the purchase of cabinetry.  Cardell sued the defendants in state court as

an action on a sworn account and breach of promissory note.  Diversified, Hindman and Cuellar

(collectively, Diversified) removed the lawsuit to this court as a diversity case.  The defendants

then filed counter-claims against Cardell for breach of contract, misrepresentation and violation

of the Tennessee Consumer Protection Act.[3]  Cardell has moved for summary judgment on its

claims and on Diversified's counter-claims for misrepresentation and violation of the Tennessee

Consumer Protection Act.

## Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."[4]

## Cardell's Suit for Sworn Account

Cardell maintains that it is entitled to summary judgment on its suit for sworn account

because its summary-judgment evidence conclusively establishes each element of its claim.  "The

essential elements to prove a sworn account are: (1) that there was a sale and delivery of

merchandise or performance of services; (2) that the amount of the account is just, that is, that

the prices were charged in accordance with an agreement or were customary and reasonable

---

[3]Docket entry # 7.

[4]Fed. R. Civ. P. 56.

prices; and (3) that the amount is unpaid."[5]  Cardell presented the following summary-judgment evidence to establish these elements.

Cardell presented a declaration by Ray Dobson, Cardell's Vice-President.[6]  In his declaration, Dobson declared the following:  Cabinet Encounters Expo, Inc.—a prior distributor of Cardell products in Nashville, Tennessee—filed for bankruptcy in 2004.[7]  Hindman and Cuellar approached Cardell about replacing Cabinet Encounters Expo as Cardell's Nashville distributor.  Hindman and Cuellar planned to start a new company called Diversified.  Hindman and Cuellar agreed that Diversified would assume Cabinet Encounters Expo's outstanding debt of $156,141.56.  Cardell extended a line of credit to Diversified through a document titled "Business Credit Application/Agreement."  Hindman and Cuellar personally guaranteed the line of credit.  Cardell manufactured, sold and delivered cabinetry to Diversified under the agreement from mid-October 2004 to March 7, 2006.  Diversified was charged according to Cardell's usual prices.  Diversified accepted the goods and merchandise reflected in the statement of account that Cardell maintained for its sales to Diversified.  In October 2005, Diversified gave Cardell a promissory note in the amount of $113,261.59.  Under the terms of the note, Diversified promised to repay the amount owed to Cardell in equal monthly installments by May 1, 2006.  Cardell demanded payment on January 31, 2006, but Diversified did not pay.  Diversified still owes $100,003.08 in principal plus interest on the note.  Diversified responded to Cardell's

---

[5]*Adams v. H & H Meat Products*, 41 S.W.3d 762, 773 (Tex. App.—Corpus Christi 2001, no pet.).  *See Burch v. Hancock*, 56 S.W.3d 257, 264 (Tex. App.—Tyler 2001, no pet.); *Powers v. Adams*, 2 S.W.3d 496, 499 (Tex. App.-Houston [14 Dist.] 1999, no pet.).

[6]Docket entry # 78, exh. F.

[7]Docket entry # 78, exh. F.

demand for payment with letter from its attorney, demanding debt forgiveness plus three million dollars. Dobson supported his declaration with copies of the Business Credit Application/Agreement,[8] a customer sales report reflecting Diversified's purchases from 2004 through 2006,[9] a statement of account reflecting an outstanding balance of $161,151.40,[10] invoices reflecting the prices for merchandise purchased by Diversified,[11] Diversified's promissory note,[12] Cardell's letter demanding payment,[13] and Diversified's response asking for three million dollars.[14] This evidence establishes the elements of Cardell's claim because it shows that Cardell sold and delivered cabinetry to Diversified, the amount of Diversified's account is based on prices that Cardell customarily charged buyers for its products, and Diversified has not paid for all merchandise it received. Having presented this evidence, the summary-judgment burden shifts to Diversified to raise a fact question about one of the elements of Cardell's claim.

Diversified responded to Cardell's motion for summary judgment on the action for sworn account in two ways: Diversified argued that fact issues exist about the elements of Cardell's claim and Diversified relied on two affirmative defenses—breach of contract and misrepresentation. Diversified's arguments are addressed below.

---

[8] *Id.*, attachment 1.

[9] *Id.*, attachment 2.

[10] *Id.*, attachment 3.

[11] *Id.*, attachment 4.

[12] *Id.*, attachment 5.

[13] *Id.*, attachment 6.

[14] *Id.*, attachment 7.

Diversified first complained that Cardell did not always deliver what Cardell had ordered, Cardell delivered non-conforming goods, and Cardell failed to timely correct defective orders. Diversified asserted that fact questions exist about whether there was a sale and delivery of goods, whether the account is just, and whether the amount should be adjusted in light of Cardell's actions.[15]  Diversified, however, did not identify the fact questions or the evidence that raise fact questions about the elements of Cardell's claim.  Moreover, these complaints form the basis of Diversified's breach-of-contract counterclaim.  No party has moved for summary judgment on that claim.  Asserting that fact questions exist without more does not raise a fact question.

Diversified also argued that a fact question exists about whether Cardell committed a material breach of contract, excusing Diversified's performance.[16]  Diversified alleges that Cardell misrepresented that it could and would deliver quality products in a timely manner.[17] Diversified further alleged that it would not have purchased Cabinet Encounter Expo's assets or entered into the Business Credit Application/Agreement had Cardell not made the representation.[18]

In Texas, a material breach of a contract may excuse payment under a contract, but I located no Texas authority permitting a defendant to rely on the defense of breach of contract to avoid payment of a sworn account.  I located one opinion in which a Texas court of appeals

---

[15]*See* docket entry # 88, pp. 11-12.

[16]*See* docket entry # 88, pp. 12-13.

[17]Docket entry # 7, p. 4.

[18]*Id*. at pp. 4-5.

determined that the affirmative defense of breach of contract had been tried by consent in a trial

on sworn account, but the court did not address the propriety of the defense.  Instead, the court

determined that the defendant could rely on the defense in the absence of a verified denial

because the breach of contract issue was tried by consent and without objection.[19]  Here,

Diversified alleges that it is excused from paying its account because Cardell failed to timely

deliver conforming goods.[20]  Diversified's remedy, however, lies under the Texas Uniform

Commercial Code as an affirmative claim for relief, not as an affirmative defense.[21]

　　　　Diversified further argued that Cardell failed to disclose its inability to tender conforming

goods in a timely manner.[22]  Diversified maintains that Cardell's failure to disclose changes to its

product line and to disclose labor problems constituted fraud which excused Diversified's

obligation to pay its account.[23]  I located no authority for an affirmative defense to a sworn

account for a failure to disclose, but Texas precedent exists for an affirmative defense based on

fraud.  Diversified pleaded fraud as an affirmative defense in its answer, alleging that Cardell's

misrepresentation about its ability to deliver conforming goods in a timely manner constituted

---

[19]*See Kahn v. Carlson*, No. 05-98-01415-CV, 2001 WL 428710, at *2 (Tex. App.—Dallas Apr. 27, 2001, no pet.).

[20]*See* docket entry # 7, p.4.

[21]In Texas, section 2.601 of the Texas Uniform Commercial Code provides for a buyer's remedies where goods fail to conform to the contract.  *See Tex. Bus. & Comm. Code Ann*. § 2.601 (Vernon 1994); *Toshiba Machine Co., Am. v. SPM Flow Control*, 180 S.W.3d 761, 771 (Tex. App.—Fort Worth 2005, no pet.).

[22]*See* docket entry # 7, p. 4.

[23]*See* docket entry 88, p. 13.

fraud barring recovery on Diversified's account.[24]

> In Texas, fraud "vitiates an otherwise apparently valid contract."[25]

> To establish fraud it must appear: (1) that a material representation was made; (2) that it was false; (3) that, when the representation was made, the speaker knew it was false or that he made it recklessly without any knowledge of its truth and as a positive assertion; (4) that the speaker made the representation with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon the representation; and, (6) that the party thereby suffered injury.[26]

As nonmovant relying on an affirmative defense in opposing a summary judgment, Diversified must present summary judgment evidence sufficient to raise a fact question about each of these elements to survive summary judgment. Diversified, however, did not identify particular fact questions or summary judgment evidence raising fact questions. Although the summary-judgment rule does not require the district court "to sift through the record in search of evidence to support a party's opposition to summary judgment,"[27] I reviewed Diversified's summary judgment evidence out of an abundance of caution to determine whether anything raises a fact question.

Diversified's summary judgment evidence consists of a declaration by Hindman discussing his dealings with Cardell, a declaration by Dr. Gregory Faulk valuating Diversified's alleged economic damages, excerpts from Dobson's affidavit, and excerpts from Shelley Bodkin's deposition. In his declaration, Hindman made the following assertions: Hindman and

---

[24]*See* docket entry # 7, p. 4.

[25]*Duke v. Merkin*, 599 S.W.2d 877, 879 (Tex. Civ. App.—El Paso 1980, no writ).

[26]*Id*.

[27]*Skotak v. Tenneco Resins*, 953 F.2d 909, 916 n.7 (5th Cir. 1992).

wife Cuellar formed Diversified June 2004 in order to purchase Cabinet Encounter Expo's assets.

Hindman obtained a court order authorizing him to purchase the assets in September 2004.  Prior

to purchasing Cabinet Encounter Expo's assets, Hindman talked with Cardell's Tennessee sales

representative, Pete Zaring, who indicated that Cardell would not object to Diversified acquiring

a Cardell distributorship.  Hindman went to San Antonio in October 2004 to tour the Cardell

plant and meet with Cardell management.  Hindman believed that he had purchased a Cardell

distributorship when he purchased Cabinet Encounter Expo's assets.  Once he arrived at Cardell,

Hindman learned that Cardell wanted Diversified to assume Cabinet Encounter Expo's debt in

order to obtain the distributorship.  Hindman told Cardell's representatives that he did not feel

comfortable assuming the debt.  Cardell's representatives assured Hindman that Diversified

would be able to pay off the debt quickly because Cardell was going to help Diversified secure

the business of its national builder account in Nashville, Beazer Homes.  Based on that

representation, Hindman agreed to assume the debt.  The debt was memorialized in the

promissory note that Hindman guaranteed and that serves as the basis of Cardell's breach-of-

promissory-note claim.  Hindman and Cuellar signed the Business Credit Application/Agreement

to commence the distributorship.  Hindman felt confident that Diversified would soon be

profitable due to business with Beazer Homes.  When Hindman asked for an introduction to

Beazer Homes, Cardell refused.  Cardell made no effort to help Diversified obtain Beazer

Homes's business.  Cardell assured Hindman that it could deliver quality products in a timely

manner.  Hindman would not have purchased Cabinet Encounter Expo's assets or become a

Cardell distributor had this representation not been made.  Cardell repeatedly failed to ship

products on time, shipped products that did not conform to orders, shipped wrong quantities of

products, shipped incomplete products, and shipped damaged or defective products.  Cardell took too long to correct defective shipments.  Cardell's failure to provide conforming shipments prevented Diversified from delivering cabinets to its customers.  Diversified's customers did not pay for the cabinets, causing a cash-crunch for Diversified.  Cardell invoiced Diversified for incomplete and defective deliveries.  When Diversified did not pay for the shipments, Cardell assessed finance charges and late fees.  When Diversified fell behind in payments, Cardell suspended deliveries.  Hindman learned from Zaring that Cardell had problems with it labor.  When Diversified became unable to pay, Cardell terminated its business relationship with Diversified and demanded payment of Diversified's account.

Cardell objected to certain portions of Hindman's declaration,[28] but I did not need to directly address those objections in making this recommendation.  At most, Hindman's affidavit raises a fact question about whether Cardell made a representation—that Cardell could provide conforming deliveries in a timely manner—and about whether the representation was false—based on Cardell's failures in some instances to deliver conforming products.  But the declaration does not raise a fact question about whether Diversified relied on the representation in purchasing Cabinet Encounter Expo as alleged in Diversified's answer[29] because Hindman declared that he purchased Cabinet Encounter Expo's assets prior to meeting with Cardell representatives.  He explained that he formed Diversified June 2004 in order to purchase Cabinet Encounter Expo's assets, that he obtained a court order authorizing him to purchase the assets in September 2004, and that he first met with Cardell's representatives in October 2004.  Hindman

---

[28]*See* docket entry #s 95 & 101.

[29]*See* docket entry # 7, p. 4.

9

stated that he thought that he had already purchased a Cardell distributorship when he met with Cardell in October 2004.  Hindman's deposition—presented by Cardell—confirmed that timing.[30]  Hindman testified that he had already closed on Cabinet Encounter Expo's bankruptcy proceedings when he met with Cardell's management in October 2004 and that he had signed the purchase agreement before he went to San Antonio.[31]  In its response to Cardell's objections to Diversified's summary-judgment evidence, Diversified attributed the purported misrepresentation that "Cardell would supply quality product [sic] in a timely manner" to Zaring[32]—Cardell sales representative—but Hindman did not attribute the alleged representation to Zaring in his affidavit.  Instead, Hindman referred to Cardell as making the representation. Hindman attributed only one representation to Zaring—that Cardell would not object to Diversified continuing as the Cardell distributor in Tennessee.  Hindman attributed even less to Zaring in his deposition, testifying that Zaring "gave [him] the impression that Cardell wanted to continue the distributorship with the entity he was purchasing."[33]  Rather that attribute a misrepresentation to any one in particular, Hindman testified that he "was under the impression that the service received from Cardell was acceptable." [34]  Hindman admitted that nothing he discovered in his due diligence contradicted his impression that Cardell produced a "reasonably

---

[30]*See* docket entry # 96, exh. A, p. 43.

[31]*See id.*

[32]*See* docket entry # 99, p. 1.

[33]*See* docket entry # 96, exh. A, p. 39

[34]*See id*. at p. 40.

good line of cabinetry, competitively priced."[35]  Hindman had already purchased Cabinet Encounter Expo's assets before he meet with Cardell representatives, and therefore, he could not have relied on Cardell's representation that it could provide conforming deliveries in purchasing the assets.

Likewise, Hindman's declaration does not raise a fact question about whether Diversified relied on the representation in signing the Business Credit Application/Agreement as alleged in Diversified's answer.[36]  Instead, Hindman stated that he agreed to assume Cabinet Encounter Expo's debt and signed the Business Credit Application/Agreement because Cardell represented that it would introduce Diversified to Beazer Homes, not because Cardell assured Diversified that it could deliver conforming shipments.

Finally, Hindman's declaration does not raise a fact question about whether Diversified relied on the representation in becoming a Cardell distributor as stated in Hindman's declaration because Hindman stated that the Cardell distributorship was the most compelling aspect of Cabinet Encounter Expo.  He explained that he signed the Business Credit Application/ Agreement to commence the distributorship based on Cardell's promise that Cardell would help Diversified obtain the business of Cardell's national builder account, Beazer Homes—not because Cardell misrepresented that it could provide conforming deliveries in a timely manner. In his deposition, Hindman testified that Diversified had a financial incentive to become a Cardell distributor because Cabinet Encounter Expo already had Cardell orders in the pipeline

---

[35]*Id.*

[36]*See* docket entry # 7, p. 4.

11

and customers who wanted Cardell cabinets.[37]  He also testified that he had already closed on the sale before Diversified became a Cardell distributor.[38]

Cardell's other summary-judgment evidence fails to establish a fact issue about the elements of Diversified's affirmative defense of fraud.  The excerpts from Ray Dobson's deposition do not raise a fact question because Dobson's testimony establishes only the following: Cardell had problems with orders from other distributors, Cardell installed some new equipment on its production line around 2004, Dobson knew that Hindman complained about incomplete shipments and defective products, Cardell management described its national builder program to Hindman when Hindman first visited San Antonio in October 2004, Dobson does not recall whether Beazer Homes was discussed during that meeting, Cardell told Hindman that it was not going to walk into a national account with an unknown entity until it knew it could count on the new entity's service, Cardell was willing to enter a national builder account with Diversified if Diversified got its house in order, and the assumption of Cabinet Encounter Expo's debt—based on products already in the pipeline—was discussed at the San Antonio meeting.[39] This evidence is consistent with much of Hindman's version of Diversified's dealings with Cardell, but it does not establish that Cardell made a false representation about its ability to deliver conforming shipments in a timely manner or that Diversified relied on such a representation.

Shelley Bodkin's deposition does not raise a fact question about whether Cardell

---

[37]*See* docket entry # 96, exh. A, p. 43.

[38]*Id*.

[39]*See* docket entry # 89, exh. 1.

misrepresented its ability to deliver conforming cabinets in a timely manner.  At most Bodkin's

deposition establishes that some Cardell shipments were nonconforming.  Bodkin is

Diversified's comptroller.  Bodkin made Diversified's payments on the promissory note for

payment of Cabinet Encounter Expo's debt.  Bodkin created a spreadsheet that reflected

problems with orders from Cardell.[40]  The spreadsheets are attached to Dr. Faulk's declaration.[41]

Dr. Faulk relied on the Bodkin's spreadsheet in conducting his valuation of Diversified's alleged

economic losses.  Nothing in Dr. Faulk's declaration, however, indicates that Cardell

misrepresented its ability to deliver conforming cabinets in a timely manner.

Diversified presented no evidence raising a fact question about the elements of Cardell's

action on sworn account or all elements of Diversified's affirmative defense of fraud.  Although

Diversified's response to Cardell's motion and Hindman's affidavit complains about on alleged

misrepresentation that Cardell would help Diversified obtain the business of Cardell's national

builder account, that allegation does not form the basis of any affirmative defense or any

counterclaim.  Consequently, arguments relating to that allegation are irrelevant to the district

court's consideration of the motion for summary judgment for the action on sworn account.

Cardell is entitled to summary judgment on its action on the sworn account.

**Cardell's Motion for Summary Judgment on Diversified's Misrepresentation Claim**

Cardell asks for summary judgment on Diversified's counterclaim for misrepresentation

on grounds that no evidence exists that Cardell made a misrepresentation to Diversified.  The

elements of a misrepresentation claim are essentially the same as the elements of a fraud defense:

---

[40]*See* docket entry # 89, exh. 2.

[41]*See* docket entry # 88, exh. 2.

13

"(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation."[42]   In its response to Cardell's motion for summary judgment, Diversified relies on the alleged misrepresentation that Cardell would introduce Diversified to the national builder account (the Beazer Homes's argument) and the alleged representation that Cardell would deliver conforming orders.[43]   Diversified's argument and evidence about the alleged misrepresentation that Cardell would introduce Diversified to the national builder account are irrelevant because Diversified did not base its misrepresentation claim on that representation.  Instead, Diversified based its claim on the alleged representation that Cardell would deliver conforming shipments in a timely manner.  Diversified's argument and evidence about the alleged misrepresentation that Cardell would deliver conforming shipments in a timely manner does not raise a fact question because the summary judgment evidence shows that Hindman had already purchased Cabinet Encounter Expo's assets before he met with Cardell's representatives in San Antonio.  Diversified presented no summary-judgment evidence raising a fact question about whether Diversified relied on the alleged representation prior to purchasing the assets.  Diversified presented no summary-judgment evidence raising a fact question about whether Diversified relied on the alleged representation in agreeing to assume Cabinet Encounter Expo's assets.  Cardell is entitled to summary judgment on Diversified's

---

[42]*Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

[43]*See* docket entry # 88, p. 16.

misrepresentation claim.

### Cardell's Claim for Breach of Promissory Note

Cardell also contends it is entitled to summary judgment on its claim for breach of the promissory note in which Diversified promised to pay Cabinet Encounter Expo's debt. "To collect on a promissory note as a matter of law, the holder or payee need only establish that (1) there is a note; (2) he is the legal owner and holder of the note; (3) the defendant is the maker of the note; and (4) a certain balance is due and owing on the note."[44] Cardell presented the following summary judgment evidence to establish these elements: (1) a copy of the promissory note signed by Hindman as Diversified's owner and guarantor in which Diversified promised to pay Cardell $113,261.59;[45] (2) Dobson's declaration in which he states: (a) Cardell is the owner of the note; (b) the note has never been pledged, transferred, conveyed or assigned; and as of the date of the declaration, Diversified still owes approximately $100,003.08 on the promissory note, plus accrued interest;[46] and (3) Hindman's deposition in which he stated that he signed the promissory note.[47] This evidence establishes the elements of Cardell's claim because it shows that a promissory note exists, Cardell owns the note, Diversified signed the note, and a balance is due and owing on the note.

In response, Diversified maintains that Cardell is not entitled to summary judgment

---

[44]*Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14 Dist.] 1994, no writ).

[45]*See* docket entry # 78, exh. F, attach 5.

[46]*See* docket entry # 78, ¶ 10.

[47]*See* docket entry # 78, exh. B, p. 64.

because a fact question exists about whether the promissory note was procured by fraud. Diversified argued that the alleged misrepresentation that Cardell made about introducing Diversified to Beazer Homes bars recovery on the note.  Diversified insisted that it would not have signed the promissory note had Cardell not offered a business opportunity with Beazer Homes.[48]  This argument, however, does not raise a fact question about the elements of Cardell's claim because Diversified's fraud defense is not based on the prospective opportunity with Beazer Homes.

Diversified pleaded fraud in defense of breach of promissory note, but that defense is based on Cardell's alleged misrepresentation about Cardell's ability to deliver conforming deliveries in a timely manner—not about an alleged misrepresentation about business with Beazer Homes.  In its answer, Diversified alleged that the "Defendants were induced to enter the note and credit application upon which Cardell has sued . . . based on misrepresentations, as further alleged below in Defendants' Original Counterclaim."[49]  In the counterclaim, Diversified alleged that it "was assured that Cardell could and would deliver quality products in a timely manner."[50]  Diversified stated that it "would not have assumed [Cabinet Encounter Expo's] debt, and Mr. Hindman would not have executed a note in Diversified's name or guaranteed any debt to Cardell"[51] but for Cardell's representation.  In support of its counterclaim for fraud, Diversified stated that Cardell represented that it would "fill purchases orders with conforming

---

[48]*See* docket entry # 88, p. 14.

[49]Docket entry # 7, pp. 4-5.

[50]*Id*. at p. 6.

[51]*Id*.

16

goods in a timely manner"[52] and that Diversified "assumed the Cabinet enCounter Expo's debt to Cardell, executed a promissory note and security agreement in favor of Cardell" in reliance of the representation.[53]  Diversified did not complain about an alleged misrepresentation about Beazer Homes.  Because it did not rely on the alleged misrepresentation about Beazer Homes in its answer or counterclaim, that alleged representation does not raise a fact question about the elements of Cardell's breach-of-promissory-note claim.  Consequently, Cardell is entitled to summary judgment on its breach-of-promissory-note claim.

**Cardell's Claim for Attorney's Fees**

Cardell also seeks summary judgment on its claim for attorney's fees.  Under the Texas Civil Practice and Remedies Code, a "person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . . a sworn account . . . ."[54]  Because Cardell has shown that it is entitled to summary judgment on its action for sworn account, it is entitled to summary judgment on its claim for attorney's fees.

**Cardell's Motion for Summary Judgment on Diversified's Claim
Under the Tennessee Consumer Protection Act**

Finally, Cardell seeks summary judgment on Diversified's claim under the Tennessee Consumer Protection Act.  Cardell maintains the claim fails because Texas law governs the parties' dispute.  Cardell relies on the choice-of-law provision contained in the Business Credit

---

[52]*Id.* at p. 10.

[53]*Id.* at p. 11.

[54]TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(7) (Vernon 1997).

17

Application/Agreement.[55]

> A federal court in a diversity case applies the choice-of-law rules of the forum state.  Texas has adopted the Restatement (Second) of Conflicts approach to contractual choice-of-law provisions.  Under Texas law, the parties' choice-of-law will be enforced unless the chosen law has no substantial relationship to the parties or the transaction or application of the law chosen would be contrary to a fundamental policy of a state that has a materially greater interest than the chosen state in the determination of a particular issue.[56]

In this case, the parties agreed to a choice of law in the Business Credit Application/Agreement.

That provision reads as follows:

> IT IS HEREBY AGREED TO, BY AND BETWEEN APPLICANT [DIVERSIFIED] AND CARDELL CABINETRY, THAT FOR ANY LITIGATION MATTER OR DISPUTE VENUE FOR SAID LITIGATED MATTER OR DISPUTE WILL BE IN SAN ANTONIO, BEXAR COUNTY, TEXAS.  THIS AGREEMENT AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY TEXAS LAW (WITHOUT REGARD TO ANY CONFLICT OF LAW PRINCIPALS) AND APPLICABLE UNITED STATES FEDERAL LAW.[57]

Diversified responded to Cardell's argument and argued that this provision does not apply to its claim under the Tennessee Consumer Protection Act because the claim sounds in tort rather than contract.[58]  Despite that position, the provision reflects the parties' intent to apply Texas law in disputes arising from the Business Credit Application/Agreement.  The choice-of-law provision indicates it applies to the agreement, the agreement's validity, the agreement's enforcement, and the agreement's interpretation.  All of Diversified's claims arise from the agreement.  Diversified

---

[55]*See* docket entry # 78, pp. 8-9.

[56]*Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico*, 304 F. Supp.2d 903, 908 (W.D. Tex. 2003).

[57]*See* docket entry # 78, exh. F, attach.1.

[58]*See* docket entry # 88, p. 17.

did not specify the basis of its claim under the Tennessee Consumer Protection Act, but its answer and counterclaims support only one provision of the Tennessee Consumer Protection Act—the provision that makes it unlawful to "[r]epresent that goods or services are of a particular standard, quality or grade . . . ."[59]  The factual allegations supporting Diversified's claim allege a misrepresentation about Cardell's ability to deliver conforming goods, a failure to deliver conforming goods in a timely manner, late and nonconforming goods, and problems resulting from Cardell's billing practice.  These claims arise from the Business Credit Application/Agreement.  Texas law bears a substantial relationship to the claims:  The alleged misrepresentation was made in Texas.  The finance charges and late fees were added to Diversified's account in Texas.  The direction to withhold shipments occurred in Texas. Although Diversified's injuries occurred in Tennessee, that state does not have a materially greater interest in this dispute than Texas.  The application of Texas law would not be contrary to a fundamental Tennessee policy in the resolution of this dispute.  Because the parties' chosen law—Texas law—bears a substantial relationship to the parties and their transactions, Tennessee has no greater interest in resolving the dispute than Texas, and the application of Texas law is not contrary to a fundamental Tennessee policy, the district court should apply Texas law and dismiss Diversified's claim under the Tennessee Consumer Protection Act.

## Recommendations

Diversified failed to raise a fact question about the elements of Cardell's claim for sworn account or Diversified's affirmative defense of fraud.  As a result, Cardell is entitled to summary judgment on its claim for sworn account.  Summary judgment on that claim will entitle Cardell

---

[59]TENN. CODE ANN. § 47-18-104(b)(7).

to an award of attorney's fees.  Diversified failed to raise a fact question about Cardell's claim

for breach of promissory note.  Consequently, Cardell is also entitled to summary judgment on

that claim.  Diversified failed to raise a fact question about all of the elements of its counter-

claim for misrepresentation.  Cardell is entitled to summary judgment on that claim.  Because

Texas law applies to this dispute, Cardell is entitled to summary judgment on Diversified's claim

under the Tennessee Consumer Protection Act.  I recommend GRANTING Cardell's motion for

summary judgment (docket entry # 78).  Because I did not need to address Cardell's objections to

Hindman's declaration to make my recommendations, I DENY Cardell's other motions (docket

entry #s 98 & 101) as moot.

   If the district court accepts my recommendations, one claim will remain in this

case—Diversified's counter-claim for breach of contract.  All deadlines have passed in this case.

The parties have already mediated the case and failed to settle.  This case is ready for trial.[60]

### Instructions for Service and Notice of Right to Object/Appeal

   The United States District Clerk shall serve a copy of this memorandum and

recommendation on all parties who have entered an appearance, by either (1) electronic

transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of

Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.

Written objections to this memorandum and recommendation must be filed within 10 days after

being served with a copy of same, unless this time period is modified.[61]  **Such party shall file**

---

[60]I have given Diversified leave to file a sealed exhibit.  See docket entry # 102.  If the exhibit is filed, I will review the exhibit and submit a supplemental recommendation as required.

[61]28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

**the objections with the Clerk of the Court, and serve the objections on all other parties and the magistrate judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.[62]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this memorandum and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[63]

**SIGNED** on November 11, 2007.

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[62]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[63]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).